IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES TERRY<br>311 Inlet Road<br>Murrells Inlet, S.C. 29576<br>        Plaintiff<br><br>        v.<br><br>THE ARCHITECT OF THE CAPITOL<br>c/o General Counsel<br>Ford House Office Building H2-265A<br>Second and D Streets SW<br>Washington, DC 20515<br>        Defendant | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, Charles Terry, brings this civil action against Defendant, the Architect of the Capitol (AOC) because the AOC has retaliated against him and created a hostile working environment against him based on his protected workplace safety complaints, relating to unsafe lead abatement practices.

Plaintiff filed suit against the AOC (Civil Action No. 1:18-cv-1733 (RBW)) on July 25, 2018 for a retaliatory hostile work environment and discrete acts of retaliation.  Due to the structure and language of the Congressional Accountability Act, which requires all discrete claims to be separately exhausted by undergoing counseling and participating in mediation at the Office of Compliance.  *See* 2 U.S.C. §§ 1402 ("To commence a proceeding, a covered employee alleging a violation of a law made applicable under part A of subchapter II shall request counseling by the Office."); 1403 (governing mediation); 1408 ("A civil action may be commenced by a covered employee only to seek redress for a violation for which the employee has completed counseling and mediation.").

In his original complaint, Mr. Terry alleged that the AOC retaliated against him and created a hostile work environment against him after he complained about the Architect assigning its Painters and Plasterers to perform lead abatement with minimal training and supervision, which lead to numerous instances of unsafe work practices which caused Plaintiff and others to ingest dangerous lead containing dust.  After Mr. Terry complained to the Office of Compliance, the Architect safety officials and his supervisors, the Architect retaliated against Mr. Terry by creating a hostile work environment, including assigning Plaintiff to perform hazardous work or to work under hazardous conditions, turning Plaintiff's co-workers against him, by blaming Plaintiff for the AOC having to impose stricter policies regarding the employee's use of leave and alternative work schedules and prohibiting Plaintiff's supervisor to communicate with Plaintiff about workplace safety concerns.

The Architect's intention was to create a hostile environment that would drive Plaintiff to resign.  That plan succeeded, and Plaintiff became increasingly concerned about his physical safety, to the point that the workplace became so intolerable that he had no choice but to resign. Plaintiff's resignation, which was a constructive discharge, became effective on or about August 1, 2018.  Plaintiff's constructive termination is a standalone claim (*Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016)); as a result, the claim was required to be separately exhausted and raised in a new Complaint. 2 U.S.C. § 1408(a) ("The district courts of the United States shall have jurisdiction over any civil action commenced under section 1404 of this title and this section by a covered employee who has completed counseling under section 1402 of this title and mediation under section 1403 of this title. A civil action may be commenced by a covered employee only to seek redress for a violation for which the employee has completed counseling and mediation."). *and*

*see Blackmon-Malloy v. U.S. Capitol Police Bd.,* 575 F.3d 699, 706 (D.C. Cir. 2009) ("the CAA's counseling and mediation requirements are jurisdictional").

Plaintiff also brings suit, premised on 2 U.S.C. § 1313, and the Little Tucker Act, 28 U.S.C. § 1346(1)(2), because, the Architect has failed to Plaintiff, the 25% Sunday differential pay to which he was entitled each Sunday, because the Plaintiff's hours began before midnight on Sunday.

## JURISDICTION

1. This is an action authorized and instituted pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. § 1301 *et seq.*).

2. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

3. Plaintiff additionally invokes this Court's jurisdiction pursuant to the Little Tucker Act 28 U.S.C. § 1346(a)(2), to recoup Plaintiff's unpaid wages in an amount not to exceed $10,000.

4. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

5. Prior to his constructive discharge, Plaintiff was an employee of the Architect of the Capitol, who worked in the District of Columbia.

6. Defendant Architect of the Capitol (Architect or AOC) is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

7. AOC is headquartered in the District of Columbia.

8. The Congressional Accountability Act makes it unlawful for the Architect to

"intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act." 2 U.S.C. § 1317.

9. 2 U.S.C. § 1313 of the Congressional Accountability Act extends the rights and protections of 29 U.S.C. §§ 206(a)(1) and (d), as well as 29 U.S.C. § 207, and 29 U.S.C. § 212(c) of the Fair Labor Standards Act to employees of the Architect of the Capitol and required the Board of the Office of Compliance to propound regulations to implement the above-referenced sections of the Fair Labor Standards Act.

10. The Architect's internal regulations require the Architect to pay Plaintiff 25% premium pay, on which Plaintiff's night time differential pay is calculated, when he works any shift that begins on a Sunday. And Plaintiff's regular tour of duty at all relevant times herein included a Monday shift, which actually commenced at 10pm on Sunday, which entitled Plaintiff to the Sunday Premium Pay.

11. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely Request for Counseling on July 30, 2018 to raise this claim at the Office of Compliance, which was within 180 days of the unlawful conduct at issue here. Plaintiff engaged in the counseling process and filed a timely Request for Mediation (on September 7, 2018) at the conclusion of the Counseling Period. Mediation closed on October 9, 2018, and Plaintiff files this suit after the expiration of 30 days from the end of the Mediation Period, and before the expiration of 90-days.

## **FACTS**

12. At all times relevant to this Complaint, Plaintiff was employed as a WG-9 Painter at

the Architect, in the House Office Buildings Jurisdiction.

13. Beginning in approximately January 2018, Plaintiff was regularly required to either abate lead paint without proper safety equipment and/or precautions or to work in close proximity to other Architect employees who are abating lead paint without proper safety equipment and/or safety precautions.

14. Because he reasonably feared that the exposure to lead paint could cause serious injury or death to himself, other employees and members of the public, including Congress and its staff, Mr. Terry filed a workplace safety complaint at the Office of Compliance on February 6, 2018.

15. Mr. Terry's supervisors learned that he was responsible for the workplace safety complaint immediately because Mr. Terry waived his right to confidentiality in order to attain a faster investigation and enforcement action.

16. On February 12, 2018 the Office of Compliance's Occupational Safety and Health Specialists, among others, met with Superintendent Weidemeyer, Asst. Superintendent Ryan Columbo, and Safety Specialist David Hicks, as well as other employees of the Architect, including an attorney from the Office of General Counsel.

17. In response to the Office of Compliance investigation, the Architect produced documents that allegedly explained the applicable lead abatement rules and procedures. The problem was that, while the Architect had written procedures for safely handling lead paint, those procedures were not being followed and the Painters were not being supervised by individuals who were experienced with lead abatement.

18. As a part of the Office of Compliance's investigation, the Occupational Safety and

Health scheduled an agreed time to review the Painters performing lead abatement.

19. Even with advanced notice of the inspection, the Occupational Safety and Health Specialists found several safety deficiencies.

20. First, the Occupational Safety and Health review determined that the Architect was violating the standard that "requires that at the outset of operations covered by the lead standard, the employer 'shall initially determine if any employee may be exposed to lead at or above the action level." Where lead is present, until the employer performs an initial exposure assessment and documents that employees performing the work are not exposed above the PEL, the employer must treat employees as if they are exposed above the PEL and implement appropriate employee protective measures, including the provision of respiratory protection, personal protective clothing and equipment, change areas, hand washing facilities, biological monitoring, and training." *Office of Compliance Report OSH 2018-03, June 1, 2018* (referring to violations of 29 C.F.R. § 1926.62(d)(1) and (d)(2)). The Office of Compliance found that this violation "could lead to death or permanent total disability, and that without regular exposure monitoring such an outcome might possibly occur in time."

21. Second, the Occupational Safety and Health review concluded that the Architect was violating the standard that "requires that all surfaces shall be maintained as free as practicable of accumulations of lead, and that clean-up methods must minimize the likelihood of lead becoming airborne." *Office of Compliance Report OSH 2018-03, June 1, 2018* (referring to violations of 29 C.F.R. 1926.62(h)). The Office of Compliance found that this violation "could lead to death or permanent total

disability, and that without regular exposure monitoring such an outcome might possibly occur in time."

22. Also in February 2018, Mr. Terry asked (through an intermediary, George Andreas) Andrew Reed for a full-face proper respirator. Mr. Reed stated that Mr. Terry did not require a proper respirator for the work he was performing.

23. On March 13, 2018, the Assistant Night Shift Supervisor, John (Alan) Radtke falsely claimed that Mr. Terry had spilled or splattered paint on the carpet of the room where he had been painting. Mr. Terry asked Radtke to show him the paint, and Radtke was unable to do so.

24. On or about March 17, 2018, Mr. Terry complained, during a shop meeting, that Mr. Radtke had instructed him to sand a door that was painted with lead paint, without a respirator and contrary to the Architect's new lead paint abatement protocols.

25. On April 15, 2018 Mr. Terry submitted a formal statement to his supervisors, including his safety complaints about having to sand down the door without proper Personal Protective Equipment.

26. On or about April 17, 2018, Mr. Terry complained to Gerald Owens (work leader) about working adjacent to an employee who was abating lead paint in violation of the safety protocols (i.e. not wetting the area down, not using glove bags to collect the lead paint and not posting signs to warn the public of the danger).

27. Later on April 15, 2018, the Night Shift Supervisor, John (Kenny) Buckler told Mr. Terry that Charles (Charlie) Bryan (Shop foreman) had instructed him not to speak to Mr. Terry any more.

28. On April 16, 2018 Andrew Reed (Safety Officer) accused Mr. Terry of having lied

about not being given a proper respirator.

29. On or about April 24, 2018 the day shift was assigned to work a project on overtime hours. Under normal circumstances, the overtime assignment would have been shared between day and night shift. Mr. Radtke explained that day shift had been given the assignment because the project involved painting with "special colors," but the excuse was false, because night shift painters regularly used "special colors."

30. Also in April, Mr. Radtke abruptly stopped providing Mr. Terry with training on the Paint Shop tint machine, although he continued to give other painters training on the machine. Mr. Terry repeatedly asked Mr. Radtke when he could continue the training, but Mr. Radtke told Mr. Terry that they would pick up the training "later."

31. On or about May 8, 2018, Mr. Terry asked Ryan Columbo for permission to change his Alternate Work Schedule (AWS) day off (on one occasion) to Monday, May 28, 2018 – rather than Friday, May 25, 2018. Columbo refused to permit Mr. Terry to move his AWS day, even though the shop had honored similar requests on other occasions.

32. On May 2, 2018, Mr. Terry asked Mr. Radtke about a career ladder promotion to WG10 because he had the time in grade and was working at the next level. On or about May 9, 2018, Assistant Superintendent Columbo responded that no ladder promotion was possible. This was contrary to past practice in the Paint shop.

33. On May 22, 2018 one of Mr. Terry's co-workers expressed his displeasure toward Mr. Terry, saying that no one could change their AWS day off because "someone" (with the implication that it was Mr. Terry) had made a complaint about it.

34. On July 11, 2018 Mr. Terry informed the Office of Compliance Occupational Safety

and Health Specialists that lead abatement work continued to be performed in an unsafe manner. Specifically, Mr. Terry advised the Occupational Safety and Health Specialists that large areas of the hallways in the Longworth Building were being abated with no containment in place while the building was open to the public.

35. Plaintiff's supervisors continued to assign Plaintiff to work in hazardous situations and conditions, and Mr. Buckler continued his practice of refusing to speak to Plaintiff about his safety concerns.

36. On numerous occasions between June and August 2018, Mr. Radtke ignored Plaintiff's questions about safety and potential hazards during shop meetings and when Mr. Radtke gave Mr. Terry his assignments.

37. The Architect also placed Mr. Terry in fear for his job. On approximately 20 occasions between June and August, when the Paint Shop Foreman (Dale Crowl) would encounter Mr. Terry in the Painter's break room, he would declare that it looked like Mr. Terry had just woken up, an accusation that Mr. Terry had been sleeping on the job, which Mr. Terry reasonably understood as a threat that Crowl would initiate an unfounded disciplinary action for allegedly sleeping on the job, an offense for which employees at the AOC have been disciplined, up to and including termination.

38. Throughout this time period, the AOC only paid Plaintiff his base rate of pay for his 8-hour Monday shift each week, even though the Monday shift actually commenced at 10pm on Sunday, which entitled Plaintiff to 25% premium pay for the 8-hour entire shift.

## **COUNT I: CONSTRUCTIVE DISCHARGE**

39. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

40. As a result of the hostile work environment that the AOC imposed against Plaintiff because of his protected activity, Plaintiff's workplace became so intolerable – particularly because of his reasonable fear for his own health and safety as a result of the hostile environment – that he felt he had no choice but to resign from his position. Thus, Plaintiff was constructively discharged from his position.

41. Plaintiff has suffered economic damages, in the form of lost income, and lost retirement credit and future income.

42. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, and humiliation, feelings of depression and anxiety.

## **COUNT III: WAGE THEFT**

43. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

44. Pursuant to the Defendant's own regulations, Plaintiff was entitled to 25% Sunday premium pay for each shift that he worked which began on Sunday.

45. The Architect did not pay Plaintiff's 25% premium pay, and although the Architect has acknowledged that it owes Plaintiff the backpay, it has not yet fully paid Plaintiff those wages.

46. Plaintiff is entitled to his lost wages because of the Architect's failure to pay him his Premium Pay, in an amount that does not exceed $10,000 hazard pay, as well as

liquidated damages.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) order the Defendant to make the Plaintiff whole by paying him any monetary and/or liquidated damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iii) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (iv) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (v) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff